LAL BHATIA
REG NO. 97562-011
FEDERAL DETENTION CENTER
5675 - EIGHTH STREET, CAMP PARKS
DUBLIN, CALIFORNIA 94568

"IN PROPRIA PERSONA"



IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAL BHATIA,                          CASE NO. CR-04-40071-CW

    Movant,

vs.

UNITED STATES OF AMERICA,

    Respondents.
_____///

**SUPPLEMENTAL DECLARATION OF LAL BHATIA**

I, Lal Bhatia, declare as follows:

1. Based on facts uncovered as a result of on-going investigation, this declaration continues to establish the record of the brazen cover-up of Manmohan K. Wig, "Wig;" Allied Group; Bank of Credit and Commerce International Ltd., "BCCI;" and others criminality, including the laundered billions for terrorists and drug dealers:

**A. Wig Launders Around $ 200 Million Through BCCI Account # 01007647.**

2. Around early 1986, Wig informed the head of BCCI's Treasury, Syed Ziauddin Ali Akbar, "Akbar" that he would be interested in depositing an additional approx. $ 200 million in cash to extend credit to Suriname, a small South American Country, known as Dutch Guiana until its independence in 1975.

3. Akbar confirmed that the transaction could be conducted through Wig's numbered account.

4. Wig caused around $ 200 million in bulk cash to be deposited in his BCCI - Miami, numbered account # 01007647, which was further credited to a Netherlands Antilles dummy company, Camari Corporation, that allegedly lent around $ 200 million to Suriname.

**B. Wig Launders Around $ 325 Million Through Attock Oil.**

5. After the oil glut of the early 1980s Nigeria's financial condition deteriorated rapidly. The country was eventually forced to reschedule its debts and turn to the International Monetary Fund "IMF" for assistance. The IMF insisted on various financial reforms, but Nigeria resisted. Partly to circumvent the IMF, Nigeria turned to countertrade: swapping oil for merchandise or loans.

6. In exchange for a U.S. $ 1.00 billion credit, the Government of Nigeria agreed to pay back BCCI with crude oil.

7. Akbar approached Wig and asked if Wig would be interested in converting

his "cash," based on a joint venture with BCCI to provide the Government of Nigeria with credit in exchange for crude oil.

8. Wig agreed, and joined the partnership through BCCI, with Attock Oil - a BCCI subsidiary and two Nigerians connected to Nigerian National Petroleum Corporation - Razar Sareef and Ibrahim Katuni. The partnership was formed to provide the Government of Nigeria with U.S. $ 1.00 billion credit in exchange for crude oil.

9. Wig caused around $ 325 million in bulk cash to be deposited in Wig's numbered accounts at BCCI - Tampa, Miami, New York and Chicago, that was further credited into accounts of Attock Oil at BCCI - Abu Dhabi and Pakistan.

10. Attock Oil through BCCI allegedly disbursed about $ 1.00 billion to the Government of Nigeria.

11. The Government of Nigeria, in return paid Attock Oil with tankers of crude oil allegedly valued at about $ 1.00 billion.

## C. Wig Launders Around $ 105 Million Through Coffee Inc.

12. An accord known as International Coffee Organization Agreement had set up a two tier price structure for coffee.

13. Coffee bought and sold in countries that had signed the agreement was propped up by a tariff, thus making it more expensive than coffee from "non-agreement" countries.

14. This opened the door for smugglers like Munther Bilbeisi, "Bilbeisi."

15. Bilbeisi would buy non-agreement coffee beans at cheap prices from Central America for resale in other parts of the world, including the Middle East countries like Jordan. However, he would smuggle the coffee beans to resell to agreement countries, like the United States, by rebagging and preparing false cargo manifests, thus evading U.S. controls and tariffs on coffee imports, and pocketing around

a 40% spread.

16. Akbar contacted Wig and inquired if Wig would be interested in depositing cash of around $ 105 million in order to finance Bilbeisi's coffee operations.

17. Wig agreed and caused about $ 105 million in bulk cash to be deposited in his numbered accounts at BCCI - Miami and Boca Raton, that was further credited to a nominee account held in the name of Coffee, Inc., at BCCI's branch at Amman, Jordan. BCCI-Amman was run by Bilbeisi's brother Fakhri, who inturn through Coffee, Inc., provided Belbeisi with a short term credit for his coffee smuggling business.

**D. Wig's Laundered Funds Are Used For Illegal Arms Sales.**

18. Around 1987 and 1988, Wig through Belbeisi tried to sell ten Northorp F-5 jet fighters and eighteen Sikorsky helicopter gunships from Jordon to Guatemala.

19. Although the fighter deal fell through, Wig through Belbeisi succeeded in arranging the sale of three helicopters, without the end user certificates, making it illegal.

20. To help with this and other military sales, Wig through his Allied Arab Bank, nominee account held in the name of Mura International, provided funding to Belbeisi.

21. Around fall 1988, one of the three aircrafts was the Royal Jordanian Air Force 719, King Hussein's personal helicopter.

22. Wig through Belbeisi paid about $ 2.1 million for the helicopters but was able to sell to the Guatemalans for about $ 5.1 million.

**E. IRS Ignores Government of India and Aziz Rehman's Complaints.**

23. Senior Internal Revenue Service "IRS" officials refused to begin an undercover investigation of BCCI despite the fact that the criminal division had developed important information about the bank:

3

24. Representatives of the Government of India had provided the IRS with evidence of a money laundering scheme involving BCCI. However, because India did not have a tax treaty with the United States, the allegations were not followed-up on.

25. Around April 1984, former BCCI employee, Aziz Rehman was interviewed by IRS special agents in IRS's Miami office, shortly after he was fired by BCCI for refusing to transport large volumes of currency which he believed to be in violation of existing Federal laws.

26. Aziz provided the IRS with documentation of bulk cash deposits and described his role as a former courier for large cash deposits to BCCI accounts of "customers" and other banks.

27. The matters stated in this declaration are based on my personal knowledge, except, as to those matters that are stated on information and belief and those matters I believe to be true.

28. If called to testify, I could and would competently testify as to those matters stated in this declaration.

29. Nothing contained in this declaration should be construed as an admission or waiver of any of my rights or remedies. All my rights and remedies are explicitly reserved.

I declare under the penalty of perjury under the laws of the United States of America that the aforesaid is true and correct.

Dated: May 9, 2011

_____
Lal Bhatia.
Declarant.

## CERTIFICATE OF SERVICE

I, Lal Bhatia, hereby certify that I hand delivered a true and correct original and copy of SUPPLEMENTAL DECLARATION OF LAL BHATIA, to the FDC-Dublin, mailroom officer with sufficient first-class postage affixed stamps addressed to:

CLERK OF THE COURT
U.S. DISTRICT COURT
1301 CLAY STREET, SUITE 400S
OAKLAND, CALIFORNIA 94612

    Pursuant to Houston v. Lack, 108 S.Ct 2379 (1988), the aforesaid document is considered filed on May 9, 2011.

    Further, since this case is designated as an E-Filing case, the Clerk is requested to kindly forward the aforesaid filing to all other parties who are entitled to receive notification in this case.

May 9, 2011

_Lal Bhatia_